STATE of Missouri, Respondent,

v.

Richard GUSTIN, Appellant.

No. 17589.

Missouri Court of Appeals,
Southern District,
Division One.

March 18, 1992.

Emmett D. Queener, Columbia, for appellant.

William L. Webster, Atty. Gen., Rudolph R. Rhodes, IV, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Richard Gustin ("Defendant") guilty of the class B felony of sale of a controlled substance (methamphetamine), § 195.211, RSMo Cum.Supp.1989, and assessed punishment at five years' imprisonment. The trial court entered judgment per the verdict.

Defendant appeals, maintaining the trial court erred in (1) receiving State's Exhibit 1—an envelope containing the alleged methamphetamine—in evidence, in that there were breaks in the chain of custody,

and (2) allowing a State's witness to "testify from written notes."

Because the sufficiency of the evidence to support the verdict is unchallenged, we set forth only the evidence necessary to adjudicate the claims of error.

In reviewing the trial court's reception in evidence of State's Exhibit 1, the facts and reasonable inferences arising therefrom are to be stated favorably to the trial court's ruling. *Cf. State v. Blair,* 691 S.W.2d 259, 260[1] (Mo. banc 1985), *cert. dismissed,* 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987); *State v. Woods,* 790 S.W.2d 253, 254[1] (Mo.App.1990).

So viewed, the evidence establishes that Robert W. Sharpe, an undercover officer of the Salem Police Department, and David Barker, an informant, arranged to purchase "crank" from Defendant on September 12, 1990. Sometime after "5:00 o'clock" that date, Sharpe rode with Barker in the latter's vehicle to a rural area of Dent County. There, they met Defendant.

Sharpe saw Barker hand Defendant a hundred-dollar bill. Defendant handed Barker "an aluminum foil packet." Barker and Sharpe drove away. Barker handed the packet to Sharpe.

Sharpe and Barker subsequently separated. Sharpe went to the police station and opened the packet. It contained two small "cellophane type triangles that appeared to have been heat-shrunk." Inside each was "a white powdery substance."

At trial, Sharpe was shown State's Exhibit 1. His testimony:

Q. What do you recognize it to be?

A. To be the evidence that I placed into this envelope, and it's dated 9/12 of '90, and these are my initials right here on the seal.

Q. What evidence are your referring to?

A. The aluminum foil packet with two small packets which were wrapped in the aluminum foil that had a white powdery substance.

Sharpe recounted he turned the evidence over to Michael Allgire, Chief of Police of the City of Salem.

Chief Allgire testified he received an "aluminum foil container" from Sharpe on September 12, 1990. It contained "two packets of off-white powdery substance." The Chief's testimony:

Q. What did you do with that object ... that Officer Sharpe gave to you?

A. At that time I had the security box in a bottom desk drawer in my office, and the substance was put in there and secured.

Q. Was it put in any other type of container at that point in time?

A. At that time, no.

. . . .

Q. Was it removed at some point in time and placed into some other container?

A. Yes, it was.

Q. When was that?

. . . .

A. It was on October the 3rd.

Q. And what did you do with it at that point in time?

A. At that point in time, I had Detective Mitch Dane and Officer Bob Sharpe both come into my office and, at that point I returned the item back to Officer Sharpe, at which time he packaged it, and it was turned over to Detective Dane, which is our evidence custodian.

. . . .

Q. I'll show you ... State's Exhibit 1 and ask if you recognize what that is?

A. Yes, I do.

Q. What do you recognize it to be?

A. This here is an envelope that Officer Sharpe, in my office, put this into— put the evidence into, and it was then sealed and turned over to Detective Mitch Dane.

Q. What evidence are you referring to that was placed in that envelope?

A. The aluminum foil with the two little packets of off-white powdery substance.

Q. Who has access to this container in your desk where you placed this foil container?

A. No one.

Q. Is it locked?

A. Yes, it is.

Q. Who has the keys?

A. I'm the only one with a key to it.

Q. Was there any change in the condition of the foil container from when you first placed it in there in September up til October when you removed it?

A. No, there was not.

Q. Had you removed it for any purpose?

A. No, I did not.

Q. Did you give anyone else your keys during that time period?

A. No, I did not.

Detective Mitchell Dane of the Salem Police Department identified State's Exhibit 1 as a manila envelope delivered to him by Officer Sharpe and Chief Allgire on October 3, 1990. Dane placed Exhibit 1 and two other sealed envelopes in a larger envelope and "sent it certified mail to Troop G at Willow Springs."

David Francis Nanneman, a forensic chemist employed by the Missouri State Highway Patrol, identified State's Exhibit 1 as "an item of evidence" that he "analyzed in the laboratory." His testimony:

Q. ... how did you receive this item?

A. This item was included in ... a larger envelope that we received in the mail.

Q. And do you know when that was?

A. It was in October the 8th, 1990.

Q. In what condition did you find that particular exhibit when you received it?

A. The envelope had evidence tape here that was intact at the time. It did not have evidence tape here at the bottom. The bottom was intact.

Q. Was it open in any fashion when you received it?

A. No, it was not.

Q. Did you open it?

A. Yes, I did.

Q. What did you do with it after you opened it?

A. I removed the contents, analyzed them, and then replaced the contents and placed the blue evidence tape on it, put my initials on the blue evidence tape and placed it in our evidence locker, and then October 19th, I turned it over to the Police Chief in the police station.

Q. Is that Mike Allgire?

A. Yes, it is.

Q. Now, with regard to what you said you did with the object that's in it, what exactly is in this exhibit?

Before Nanneman answered, defense counsel objected that there was "a complete break in the chain." Counsel argued:

There's testimony that this was received and placed in the mail on October the 3rd, 1990, but this person has testified that he did not ... receive whatever he received until October 8th, 1990. That's a five day gap breaking the chain that nobody's here to testify what has happened or what did not happen to that envelope. And additionally ... we don't have any testimony ... that there was any certification returned as required by law. I think there is a complete gap, a break here of five solid days that can't be cleared by the State....

The trial court overruled the objection, whereupon Nanneman's testimony continued:

Q. ... what did you find when you opened this State's Exhibit 1?

A. There was a foil package that contained two corners of a plastic bag that had been heat-sealed and containing an off-white substance.

Q. Were those white containers open in any fashion?

A. No.

Nanneman weighed and tested the substance and determined it contained methamphetamine. Later in his testimony, this occurred:

Q. ... when you obtained this State's Exhibit 1 consisting of the envelope, who did you receive it from?

A. It was Ida McClelland, the evidence clerk in the laboratory, handed me the envelope that was mailed to the Highway Patrol Headquarters in Willow Springs, Missouri.

Q. Did you find any indication that the envelope had been tampered with in any way?

A. No, I did not.

Defense counsel thereupon registered the following objection:

... I'm going to object and ask that the Court strike from the record all the evidence again received in this case. We've come up, based on the last testimony, we've come up with a second break in the chain in that he has no personal knowledge that this came in the mail. He said that he received it from someone else, who was the evidence clerk, and there is no evidence where that clerk came up with it. We've got two complete breaks....

The trial court overruled the objection and denied the request to strike.

After Nanneman's testimony, the prosecutor recalled Chief Allgire. He confirmed State's Exhibit 1 was returned to him by Nanneman. Asked whether the exhibit had been altered between the time he (Allgire) turned it over to Dane and the time he (Allgire) received it back from Nanneman, Allgire replied: "There was just the blue tape here on the bottom."

At the conclusion of Allgire's testimony, the prosecutor offered State's Exhibit 1 in evidence. Defense counsel spoke:

... I'm going to renew my objections based on those two problems that I've already stated, in that, number 1, there's a five day gap in the chain where we don't know what happened to the evidence or where it went. Second, there's another second break in the chain in that this person has no personal knowledge that it was received by a clerk. He has no personal knowledge it was actually received in the mail. This is hearsay.... Third, I don't recall ... the Chief saying that it was sealed after he got it and put back in the desk and kept in that condition until the preliminary hearing in October of '91. I think there are three breaks in that chain, Your Honor, and any one of them would be sufficient— any gap is a gap which does not complete that chain of custody with this evidence, and I object to it being received at this time.

The trial court overruled the objection and received the exhibit in evidence.

Defendant's first point relied on avers the trial court erred in receiving State's Exhibit 1 in evidence. As we comprehend the point, Defendant claims the State failed to establish with reasonable assurance that: (1) the substance tested by Nanneman was the substance purportedly received by Barker from Defendant, (2) the exhibit was in substantially the same condition when analyzed by Nanneman as when received by Barker, and (3) the exhibit was in the same condition when admitted in evidence at trial as when received by Barker.

In the argument that follows the point, Defendant identifies five "breaks" in the chain of custody. The first break, says Defendant, was the prosecutor's failure to have the aluminum foil packet and its contents specifically marked as an exhibit, identified by Barker and Sharpe, and introduced in evidence. Defendant maintains: "The aluminum foil packet, and the substance contained in the aluminum foil packet, was never marked as an exhibit, identified as an exhibit, or specifically received into evidence as an exhibit. State's Exhibit 1 was identified only as an evidence envelope." Additionally, Defendant points out that the prosecutor failed to produce Barker at trial to identify the foil packet as the one he received from Defendant and handed Sharpe.

■ To preserve a claim of error in the reception of evidence, an accused must object with sufficient specificity to apprise the trial court of the grounds for the objection. *State v. Stepter*, 794 S.W.2d 649, 655[11] (Mo. banc 1990). The grounds asserted on appeal are limited to those stated at trial. *State v. Johnson*, 483 S.W.2d 65, 67–68[5] (Mo.1972). A litigant is not permitted to broaden the objection he presented to the trial court; he may not rely on a theory different than the one offered at trial. *State v. Herrick*, 814 S.W.2d 660, 663[3] (Mo.App.1991); *State v. Bostic*, 789 S.W.2d 804, 807[1] (Mo.App.1990); *State v. Clark*, 759 S.W.2d 372, 374[4] (Mo.App. 1988).

■ Nowhere in the transcript do we find any objection by Defendant at trial regarding the failure to assign separate exhibit numbers to the envelope, the foil packet, and each of the two heat-sealed plastic bindles containing the methamphetamine. While a more precise record might have been created had that been done, it is evident that when the witnesses testified about State's Exhibit 1, they were referring to the foil packet and its contents, collectively. The record yields no indication that marking the envelope encasing the evidence as State's Exhibit 1 instead of marking each of the individual components separately created any confusion.

We also note the objections by Defendant at trial to State's Exhibit 1 included nothing about the failure of the prosecutor to produce Barker to identify the foil packet and its contents.

For the above reasons, we hold the first alleged "break" in the chain of custody on which Defendant relies in support of his first point was not preserved by objection at trial. Consequently, it is not cognizable in this appeal.

■ The second "break" relied on by Defendant is, in the words of his brief, "the period of time between when the aluminum foil packet was allegedly received by Sharpe and when it was secured in the police station." Defendant directs our attention to the following testimony by Chief Allgire on cross-examination:

Q. Do you recall whether Officer Sharpe contacted you on September 12th, 1990?

A. Yes, he did.

Q. What time did he contact you?

A. I don't recall the time.... I know it was late.

Q. When you say late, can you tell us how late?

A. It was after office hours, 'cause I always leave the office between 4:30 and 5:00, and I was already home, and if I recall, I believe I was even in bed when he called me and notified me that, you know, he had some stuff that he needed to turn over to me.

Q. ... I assume it was probably dark by that time, correct?

A. Yes, sir.

According to Defendant, the above testimony "leaves a gap of several hours between 5:00 o'clock, when the aluminum foil packet was allegedly received from [him], and the late night hours when Allgire got out of bed to receive the packet from Sharpe at the police station." Defendant asserts the State presented no evidence demonstrating the packet "was safeguarded during this period of time." Defendant adds that the evidence indicates Sharpe spent some or all of that time in Barker's presence. Defendant reminds us criminal charges were then pending against Barker. Thus, says Defendant: "As a result of the lapse of time between Sharpe's receipt of the aluminum foil packet and its placement in Allgire's security box, and the highly questionable character of Barker, with whom Sharpe was present during some or all of the time that passed, there is no 'reasonable assurance' as to where the evidence was stored or in what condition or upon what safeguards."

Nowhere in the transcript do we find any objection by Defendant at trial based on the second alleged "break" in the chain of custody. Had such objection been made, it is likely the prosecutor could have adduced testimony from Sharpe as to what he did to ensure the integrity of the foil packet and its contents between the time he received the item from Barker and the time he surrendered it to Allgire.

However, we need not speculate about what the evidence might have shown. The transcript clearly demonstrates the second alleged "break" in the chain of custody on which Defendant relies in support of his first point was not preserved by objection at trial; hence, it is not before us for review.

■ The third "break" in the chain of custody, says Defendant, was "the inconsistency between Sharpe's and Allgire's testimony regarding how the aluminum foil packet was packaged and safeguarded between September 12, 1990, and October 3, 1990."

Defendant emphasizes Sharpe testified he put the foil packet in an envelope September 12, 1990, at the police station, sealed the envelope, and turned it over to Allgire. Sharpe's testimony, argues Defendant, conflicted with Allgire's testimony that when he (Allgire) received the foil packet from Sharpe, it was not encased in an envelope.

We have studied Allgire's testimony. Neither the questioning nor his answers are as precise as they should have been, and the testimony is susceptible to the interpretation Defendant makes. However, whether the foil packet was placed in the manila envelope by Sharpe when he surrendered it to Allgire on September 12, 1990, or when Allgire and Sharpe passed it on to Detective Dane on October 3, 1990, is of no significance in determining whether the evidence remained intact and uncontaminated while in Allgire's possession. Allgire's uncontradicted testimony was that the foil packet was locked in a security box in his desk from the time he received it from Sharpe until they turned it over to Dane. During that interval, the box was locked; Allgire had the only key.

Furthermore, nowhere in the transcript do we find any objection by Defendant at trial based on the third alleged "break" in the chain of custody. Consequently, like the first two "breaks," the third is not preserved for review.

The fourth "break" in the chain of custody, says Defendant, was the period from October 3, 1990, to October 8, 1990, when State's Exhibit 1 was en route by mail from the police station to the Highway Patrol laboratory. Defendant reminds us the prosecutor presented no documentation showing mailing by certified mail or receipt by Highway Patrol personnel. Defendant adds there was no testimony from any witness that State's Exhibit 1 was received at the laboratory in the normal course of business, and the clerk from whom Nanneman said he received the item did not testify at trial.

As we have seen, this objection was preserved at trial.

In order to receive testimony showing the results of tests performed on articles, it is necessary to satisfy the court not only as to the identity of the articles, but also that they were in the same condition when tested as when originally obtained. *State v. Myers*, 351 Mo. 332, 172 S.W.2d 946, 949 (1943); *State v. Dunagan*, 772 S.W.2d 844, 856[6] (Mo.App.1989); *State v. Scott*, 647 S.W.2d 601, 607[8] (Mo. App.1983). The sufficiency of evidence establishing a chain of custody demonstrating there has been no improper tampering with an exhibit is a matter addressed to the sound discretion of the trial court. *State v. Murray*, 630 S.W.2d 577, 581[9] (Mo. banc 1982). The proof need not exclude every possibility that the evidence has been disturbed. *State v. Huff*, 789 S.W.2d 71, 78[9] (Mo.App.1990); *State v. Jones*, 760 S.W.2d 536, 538[6] (Mo.App.1988); *State v. Fels*, 741 S.W.2d 855, 857[2] (Mo.App.1987). The proof is sufficient if it provides reasonable assurance that the exhibit was in the same condition when tested as when originally obtained. *Huff*, 789 S.W.2d at 78[9]; *Jones*, 760 S.W.2d at 538; *Fels*, 741 S.W.2d at 857. The reasonable assurance standard does not require proof of hand-to-hand custody. *Huff*, 789 S.W.2d at 78[9]; *Jones*, 760 S.W.2d at 538[6]; *Fels*, 741 S.W.2d at 857[2].

In *State v. Turnbough*, 729 S.W.2d 37 (Mo.App.1987), a law enforcement officer in St. Louis mailed substances believed to be cocaine to a laboratory in Chicago for testing. The accused argued the proof failed to establish that the substances tested were the ones obtained from him and that they had not been tampered with prior to analysis. *Id.* at 39. Rejecting that contention, the Eastern District of this Court held a "highly detailed chain of custody" is not required to satisfy the "reasonable assurance" standard. *Id.* at 40. The opinion noted the exhibits were marked by the officer who received them from the accused. The officer then transferred custody of the exhibits to another officer, who deposited them in a limited access vault. Later, that officer mailed the exhibits to the Chicago laboratory. *Id.* The chemist who tested the substances testified the bags appeared

unopened when received by him for analysis. *Id.* at 41.

Similar circumstances exist here. Sharpe testified that after examining the contents of the foil packet, he placed the item in an envelope and "marked it for evidence." As noted earlier, Sharpe identified State's Exhibit 1 as the envelope, and recognized his initials "on the seal." Dane identified State's Exhibit 1 as an envelope he received from Sharpe and Allgire, and which he mailed to the Highway Patrol laboratory. Nanneman testified the heat-sealed plastic bindles were intact when he received them, and the envelope (State's Exhibit 1) showed no indication of tampering.

Defendant points out that in *Turnbough*, registered mail receipts confirming the exhibits were delivered to the laboratory in Chicago were offered as evidence. 729 S.W.2d at 40. As noted earlier, no such documentation was presented at Defendant's trial. Defendant declares, "The state's failure in the present case to put into evidence a return receipt ... demonstrating that State's Exhibit 1 was properly received at the Highway Patrol laboratory further undermines any 'reasonable assurances' that the substances tested ... [were] in the same or in like condition as when ... purportedly received by Barker."

We fail to see how the absence of a certified mail receipt is fatal to the admissibility of State's Exhibit 1. Nanneman's description of the foil packet and contents he received matches Sharpe's description of the foil packet and contents Defendant handed Barker. The envelope encasing the packet was intact when Dane mailed it, and was intact when Nanneman received it. Furthermore, and of greatest importance, it can be reasonably inferred from the evidence that the two heat-sealed plastic bindles containing the methamphetamine were intact when Sharpe received the foil packet on September 12, 1990, and were still intact when Nanneman received them October 8, 1990.

Given the discretion with which the trial court is vested in determining whether the evidence demonstrates reasonable assurance that a substance was in the same condition when tested as when originally obtained, we hold the evidence here is sufficient to support an affirmative finding by the trial court on that issue. Defendant's contention that the fourth "break" in the chain of custody rendered the test results inadmissible is without merit.

The final alleged "break" relied on by Defendant in support of his first point occurred after the substances were tested by Nanneman.

Chief Allgire testified he opened State's Exhibit 1 during a preliminary hearing, inferably October 19, 1990. Defendant asserts, "The state offered no evidence to demonstrate that State's Exhibit 1 or the aluminum foil packet was properly stored or safeguarded after the envelope was opened at the preliminary hearing until the day of trial." Defendant adds, "Allgire did not testify, and could not, that the aluminum foil packet or the substance contained therein was in the same condition at trial as when it was purportedly received by Barker." Furthermore, says Defendant, Sharpe likewise failed to testify that the packet and the substance therein were in the same or like condition when introduced at trial as when Sharpe purportedly received them.

Citing *State v. McCrary*, 478 S.W.2d 349 (Mo.1972), and *State v. Dee*, 752 S.W.2d 942 (Mo.App.1988), Defendant proclaims, "To be admissible, the evidence must be in the same or in like condition when offered at trial as when received from a defendant."

It is axiomatic that where an accused is tried for selling a controlled substance, proof that the commodity sold was a controlled substance is essential for a submissible case. *Cf. State v. Bridges*, 398 S.W.2d 1, 6 (Mo. banc 1966). Obviously, it is imperative that the evidence demonstrate reasonable assurance that the substance tested by the chemical expert was in the same condition when tested as when the accused parted with it. However, once testing is completed, the integrity of the results is assured regardless of what happens thereafter to the substance. There-

fore, Nanneman's testimony regarding his findings was admissible even if a "break" occurred in the chain of custody after he returned the evidence to Allgire. A chain of custody break from that point forward could affect, if anything, only the admissibility of the exhibit itself, not the admissibility of the test results.

 Chain of custody of an exhibit is irrelevant where the exhibit is positively identified at trial. *State v. Ingram*, 607 S.W.2d 438, 441[6] (Mo.1980); *State v. Fischer*, 774 S.W.2d 495, 497[3] (Mo.App. 1989). *See also: Fels*, 741 S.W.2d at 857[3], (chain of custody of plastic baggie of marijuana is irrelevant when the exhibit is positively identified at trial), and *State v. Benson*, 718 S.W.2d 664, 666[3, 4] (Mo.App. 1986), (chain of custody of bag of marijuana is irrelevant when the exhibit is positively identified at trial).

 At trial in the instant case, Sharpe positively identified the foil packet and its contents as the item he saw Defendant hand Barker, and which Barker thereafter handed him (Sharpe). This supplied an ample foundation for admission of that evidence.

*State v. Weber*, 768 S.W.2d 645 (Mo.App. 1989), relied on by Defendant, is inapposite. There, 34 items were seized in a residence. The record was vague as to which officers found which items and who tagged the items. One officer testified he turned the items over to a police chief. The chief denied this. Another officer testified he received some of the items from the chief. There was no showing of where the exhibits were for one seven-day interval. *Id.* at 647. Furthermore, the evidence failed to show that articles tested by a chemist were in substantially the same condition when tested as when seized. *Id.* at 648. Obviously, the facts in *Weber* are wholly different than those in the instant case. *Weber* does not aid Defendant.

We hold the fifth "break" in the chain of custody did not render State's Exhibit 1 inadmissible. Defendant's first point is, accordingly, denied.

Defendant bases his second point on a portion of Chief Allgire's testimony:

Q. Did you have occasion to speak with Officer Sharpe on March the 12th of 1990? I see you referring to some notes before you. Do you have any independent recollection of whether you talked to him on March the 12th ...

A. I don't recall.

Q. ... pardon me, September 12th?

A. September 12th? Yes.

Q. Do you recall that independent of you referring to your notes?

A. According to my notes, yes.

Q. For what reasons did you meet with Officer Sharpe that date?

A. At that date he had telephoned me and advised that he had some evidence and information that he needed to pass on to me.

Allgire then narrated his account of receiving the foil packet and its contents from Sharpe and placing such evidence in the security box in his desk. That testimony is set forth earlier in this opinion. After explaining that he later removed the evidence, Allgire was asked, "When was that?" Defense counsel interposed the following objection:

Your Honor, I'm going to object, and I ask the Court to note that he's refreshing his recollection or he's glancing at the notes and according to rules I have a right to see what it is he's using to refresh his recollection. So I'll object at this time.

The trial court overruled the objection. Allgire then testified about turning the foil packet and its contents over to Dane for mailing to the Highway Patrol laboratory. That testimony is set forth earlier in this opinion.

Defendant's second point charges the trial court with error in allowing Allgire to testify from written notes. Defendant insists no proper foundation was laid to permit Allgire to refresh his recollection from notes, and no proper foundation was laid to qualify the notes as a past recollection recorded. With commendable industry, De-

fendant has favored us with a scholarly dissertation of the law on those subjects.[1]

Defendant's complaint, as we fathom, is twofold. First, he assails Allgire's use of notes in identifying September 12, 1990, as the date Allgire received the foil packet and its contents from Sharpe.

The frailty in this claim of error is that the testimony was received without objection by Defendant. Consequently, any error in its admission was not preserved for appellate review. *State v. Graves*, 588 S.W.2d 495, 499[4] (Mo. banc 1979); *State v. Kelly*, 539 S.W.2d 106, 110[8] (Mo. banc 1976).

The second alleged error complained of in Defendant's second point is Allgire's reliance on notes in identifying October 3, 1990, as the date he turned over the foil packet and its contents to Dane for mailing to the Highway Patrol laboratory. As reported above, defense counsel made a timely objection that Allgire was using notes "to refresh his recollection." However, the objection presented no issue regarding admissibility of the notes as a past recollection recorded.

We learned earlier that a litigant may not, on appeal, broaden the objection he presented at trial, nor may he rely on a theory different than the one offered at trial. *Herrick*, 814 S.W.2d at 663[3]; *Bostic*, 789 S.W.2d at 807[1]; *Clark*, 759 S.W.2d at 374[4]. Therefore, in addressing Defendant's second point we need consider only whether the trial court committed reversible error in (a) allowing Allgire to refresh his memory from notes when he identified October 3, 1990, as the date he turned over the foil packet and its contents to Dane for mailing to the Highway Patrol laboratory, and (b) rejecting defense counsel's request to see the notes.

A witness, while testifying, may refresh his recollection by a writing or report prepared by him or known by him to be correct. *State v. Patton*, 255 Mo. 245, 164 S.W. 223, 225 (1914); *State ex rel. Pini v. Moreland*, 686 S.W.2d 499, 502[5] (Mo. App.1984). The foundation for use of a report to refresh recollection is that the witness must exhibit both a lack of present memory and the need for aid of the writing for recall before being allowed to refer to it. *State v. McKinney*, 763 S.W.2d 702, 708 (Mo.App.1989); *Pini*, 686 S.W.2d at 502[5].

Here, it is arguable that the required foundation was laid when the prosecutor, endeavoring to adduce from Allgire that the date he received the foil packet and its contents from Sharpe was September 12, 1990, asked whether Allgire recalled the date "independent of . . . referring to your notes." Allgire responded, "According to my notes, yes." This may be susceptible to an inference that Allgire could not independently recall the date and needed the notes to refresh his memory, and likewise needed them later when asked what date he turned over the foil packet and its contents to Dane for mailing to the Highway Patrol laboratory.

However, we need not decide whether the above testimony supplied a sufficient foundation for Allgire to refresh his memory from the notes. An accused claiming error in the reception of evidence has the burden of showing both error and prejudice. *State v. Minton*, 782 S.W.2d 134, 136[1] (Mo.App.1989); *State v. Reyes*, 740 S.W.2d 257, 263[4] (Mo.App.1987); *State v. Lantigua*, 652 S.W.2d 177, 178[1] (Mo.App. 1983); *State v. Hankins*, 612 S.W.2d 438, 439[1] (Mo.App.1981). On admissibility issues, an appellate court will not reverse for mere error, but only if the error was so prejudicial that it deprived the accused of a fair trial. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

Here, Detective Dane testified without objection that he received State's Exhibit 1 from Allgire on October 3, 1990, and mailed it to the Highway Patrol laboratory. Therefore, Allgire's testimony that the date was October 3, 1990, was cumulative.

If evidence is improperly admitted, but other evidence before the court establishes

---

**1.** The lawyer who wrote Defendant's brief is not the lawyer who represented Defendant at trial.

essentially the same facts, there is no prejudice and no reversible error. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982); *State v. Marvel*, 756 S.W.2d 207, 213[11] (Mo.App.1988); *State v. Carter*, 670 S.W.2d 104, 108[12] (Mo.App.1984). Consequently, even if the trial court erred in allowing Allgire to refer to notes in testifying that October 3, 1990, was the date he turned over the foil packet and its contents to Dane (an issue we leave undecided), such ruling was not prejudicial.

The same is true of the trial court's denial of defense counsel's request to see the notes. Nothing in the record suggests any possibility that Defendant was prejudiced by the ruling.

Defendant's second point is denied, and the judgment is affirmed.

PREWITT, P.J., and PARRISH, J., concur.